**MILLER TABAK HIRSCH & CO., MTH Holdings, Inc., Tax Matters Partner, Petitioners–Appellees,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellant.**

No. 218, Docket 95–4216.

United States Court of Appeals, Second Circuit.

Argued Oct. 3, 1996.

Decided Nov. 21, 1996.

John Peter Coll, Jr., New York City (Christopher P. Johnson, Donovan Leisure Newton & Irvine, New York City, of counsel), for Petitioners–Appellees.

Sally J. Schornstheimer, Attorney, Tax Division, Department of Justice, Washington, DC, (Loretta G. Argrett, Assistant Attorney General, Washington, DC; Gary R. Allen, Ann B. Durney, Attorneys, Tax Division, Department of Justice, Washington, DC), for Respondent–Appellant.

Before: KEARSE, LEVAL, and CABRANES, Circuit Judges.

LEVAL, Circuit Judge:

This appeal challenges the United States Tax Court's interpretation of a settlement

agreement between the Internal Revenue Service (the "IRS") and Miller Tabak Hirsch & Co. (including its affiliate MTH Holdings, Inc., Tax Matters Partner) (collectively "MTH").

The IRS asserted numerous adjustments to MTH's partnership tax returns for tax years 1982–1985. MTH filed suit in the tax court contesting the IRS's determinations. The parties eventually agreed to settle their dispute by making two adjustments to MTH's returns. MTH then asked the court to infer a third adjustment, as implicit in one of those agreed upon in the settlement, and to enter judgment predicated on this third adjustment as well as the two expressly set forth in the agreement. The IRS responded that the proposed additional adjustment was neither included in the unambiguous language of the settlement nor agreed to by the parties. The tax court (Laro, *Judge*) agreed with MTH and ordered that the judgment include the third adjustment. In our view, this ruling erroneously deprived the IRS of the settlement it had negotiated.

### Background

MTH is a limited partnership that acts as a broker/dealer in equity securities and related options, fixed income securities, and futures contracts. MTH uses the accrual method and files its tax returns on a calendar year basis.

In September 1989, the IRS served MTH with two notices of final partnership administrative adjustment. Among many items adjusted were (1) ordinary losses arising out of stock option transactions for taxable years 1982 through 1985; and (2) interest expense deductions arising out of MTH's repurchase agreements for taxable years 1982 through 1985.

### A. *The Stock Option Transactions*

On its tax returns for 1982–85, MTH claimed millions of dollars of ordinary losses resulting from stock option transactions. The IRS sought to disallow at least $28 million of these losses in their entirety on the grounds that MTH entered into the stock option transactions primarily to generate tax losses and not for profit, *see* I.R.C. § 165(c),

and that the transactions did not have the requisite economic substance to warrant recognition of the resulting losses. *See* Treas. Reg. § 1.165–1(b). As a fallback position, the IRS argued that MTH did not qualify as a dealer in stock options and therefore the losses must be treated not as ordinary losses, but rather as capital losses. *See* I.R.C. § 1221(1).

### B. *The Repurchase Agreements*

MTH's returns also claimed interest expense deductions arising from repurchase agreements, known in the trade as "repos." Under these repo agreements, MTH contracted to sell Treasury Bills in one tax year and repurchase them in the next tax year. We have characterized such a repurchase agreement as "a loan in the amount of the proceeds of the original sale, collateralized by the T–Bill, with interest equal to the difference between the sale and repurchase prices." *United States v. Manko,* 979 F.2d 900, 902 (2d Cir.1992), *cert. denied,* 509 U.S. 903, 113 S.Ct. 2993, 125 L.Ed.2d 687 (1993). These transactions "created tax advantages because, until the tax laws changed in 1984, a securities dealer could deduct the interest payments on the loan as they accrued, but only had to report the corresponding gain from the appreciation of the T–Bill at maturity. If the T–Bill matured in the tax year after the repurchase agreement was made, the taxpayer would be able to defer income equal to the amount of interest accrued in the first year." *Id.*

The IRS contended that MTH used the repurchase agreements solely to defer interest income attributable to the T–Bills, and that the repurchase agreements should thus be disregarded for federal income tax purposes. Disregarding each repo transaction would require adjustments to MTH's tax returns in two successive years: MTH's interest expense deductions in the first year would be disallowed; and roughly commensurate interest income realized in the second year upon the maturing of the repurchased T–Bill would likewise be disregarded. These adjustments, in combination, would have the effect of backing income into the prior tax years.

### C. *The Litigation and Settlement*

As noted, MTH filed suit in tax court in December 1989 contesting the adjustments. Over the next five years, the parties settled or conceded all the IRS's adjustments except those described above, relating to stock option and repo transactions.

Approximately one week before trial was scheduled to begin, the parties agreed to settle all the remaining issues based on two adjustments to MTH's tax returns. In a letter dated February 23, 1995, MTH's counsel wrote to the IRS "to confirm that [MTH has] accepted the settlement offer that [the IRS] conveyed to me." The letter stated:

> Petitioners and the IRS have agreed to settle all issues in these consolidated cases based upon the following adjustments: (i) a reduction of $1,000,000 in interest deductions claimed for the tax year ended December 31, 1982 and (ii) a recharacterization from ordinary to capital of $2,000,000 in losses claimed for the tax year [ended] December 31, 1983.

On February 28, the parties informed the tax court that they had reached a settlement and provided a copy of the settlement letter to the court. The court stated its understanding of the settlement agreement as follows: "[T]he parties have agreed to ... a reduction of a million dollars in interest deductions for 1982 and a recharacterization from ordinary [to] capital of $2 million in losses for the year 1983." Both parties responded that this was correct. The court ordered the parties to file decision documents reflecting the adjustments by March 30.[1]

### D. *The Current Dispute*

The IRS submitted documents reflecting the two agreed adjustments, namely the elimination of $1 million in interest deductions for 1982 and the recharacterization from ordinary to capital of a $2 million loss in 1983.

MTH objected. It contended that the judgment should also reflect a reversal of income in the amount of $1 million for 1983, which MTH contended was an implicit corollary to the agreed disallowance of the $1 million interest deduction for 1982.

The parties submitted competing proposals to the tax court, and each moved for entry of judgment. At oral argument, both parties agreed that the settlement letter was unambiguous. MTH further conceded that the proposed reversal of $1 million of income for 1983 was not mentioned either during the settlement negotiations or in the settlement agreement. Nevertheless, MTH argued that this reversal of 1983 income should be included in the judgment because it flowed logically from the disallowance of interest deductions in 1982.

The IRS acknowledged that had it proved *at trial* (or had MTH conceded) that the repo transactions were shams, this would have resulted in the reversal of interest income in the second years in amounts very close to the disallowed interest expense deductions in the first years.[2] The IRS argued, however, that in arriving at a settlement, the parties were not constrained to follow either side's litigation theories, but rather were free to settle all the issues in the case based on bottom line adjustments. The IRS asserted that it "agreed to the settlement based on the two terms viewed together, and that the first adjustment, reducing an ordinary deduction by $1 million, was not strictly [a] settlement of the repo issue, but part of the overall package that also settled the major issue in the case, the stock option issue."

On August 18, 1995, the tax court issued an oral decision in favor of MTH. The court found that:

> The instant record disproves [the IRS's] claim that the $1 million [reversal in in-

---

1. Under Rule 155 of the Rules of Practice and Procedure of the United States Tax Court, after a decision has been reached on the issues in a case, the tax court may direct the parties to file papers known as decision documents indicating the adjustments to be made to the taxpayer's return.

2. The IRS's documents show that the aggregate disallowed first year expense deductions exceeded the related second year interest income by $93,249.

come] for 1983 is not part of the stipulation. In addition to the fact that the February 28, 1995, transcript does not limit any subsequent year adjustments that properly flow from the agreed-upon adjustments, the record indicates that the parties always considered a disallowance of the subject interest to require a corresponding reduction in the following year's income. To the extent that [the IRS] now claims that [it] did not specifically agree to the $1 million adjustment in 1983, we consider such a claim to be without merit. [The IRS's] claim creates $1 million of income that does not exist.

The IRS appeals.

### Discussion

The parties agree that the language of the settlement letter is unambiguous, and thus that there is no basis for resorting to extrinsic evidence of their intent. *See Goldman v. Commissioner*, 39 F.3d 402, 405–06 (2d Cir.1994)(meaning of unambiguous settlement agreement must be determined without reference to extrinsic evidence). The settlement letter makes no mention of a $1 million income reversal for 1983. Furthermore, MTH concedes that the issue of the $1 million income reversal was never discussed in the settlement negotiations.

Nonetheless, MTH contends that a logical understanding of the settlement requires that the elimination of a $1 million interest deduction from 1982 be matched by a roughly corresponding diminution of income in the following year. MTH contends it could not logically have agreed to the disallowance of the 1982 losses without a commensurate reversal of 1983 income, because to do so burdened MTH with an extra $1 million in taxable income.

The argument is flawed. It fails to recognize a fundamental difference between a settlement and a judgment reached by the court on the basis of findings on disputed issues.

MTH is correct that had the IRS succeeded in proving *at trial* that the repo transactions were shams and should be disregarded, the disallowance of interest deductions in the first years would have been

roughly matched by reversal of interest income reported in the second years. The main impact of such a *finding* would have been to move income into a preceding year, rather than to enlarge the net amount of aggregate income. It does not follow, however, that the parties were constrained to settle the case using this framework. The parties were free to settle the case in any manner not violative of law or public policy, regardless of what the result might have been had the parties gone to trial. *Cf. Ho v. Martin Marietta Corp.*, 845 F.2d 545, 548 (5th Cir.1988)("Under familiar contract principles, the parties were free to agree to any terms, not opposed to public policy, that would settle the ... claims.").

MTH's argument ignores the crucial fact that, in so settling, the IRS not only relinquished its claim to back additional income related to the repos into prior tax years but also gave up the adjustments disallowing more than $28 million in ordinary losses from stock option transactions. Recognition of this fact undermines MTH's argument that the disallowance of the 1982 expense deduction without reversing 1983 income unfairly distorts the resolution of the repo controversy. By agreeing to a $1 million increase in 1982 income, MTH avoided the risk that millions of dollars of income would be backed into prior years and that at least $28 million of loss deductions would be disallowed. Seen as part of an overall settlement, MTH's agreement was altogether logical.

MTH contends, however, that the settlement agreement should be read to include any further adjustments that flow logically from those explicitly agreed. In support of this contention, MTH points out that the IRS allowed certain MTH partners to carry forward their share of MTH's $2 million capital loss for 1983 into subsequent years, notwithstanding the silence of the settlement agreement as to adjustments to taxable income in future years.

The fact that the IRS does not contest the partners' right to carry forward capital losses, despite the settlement agreement's silence on this issue, does not undermine the IRS's position that the settlement constituted the entire agreement of the parties. A part-

ner's carryover of capital losses stands on a different footing from the reversal of income sought by MTH because this right arises from the application of the Internal Revenue Code to the MTH partnership return.[3] Section 1212(b)(1) allows taxpayers to carry forward net capital losses into subsequent tax years. I.R.C. § 1212(b)(1). Thus, once MTH's returns were adjusted to reflect the capital loss, the Code automatically operated to allow MTH partners, depending on the capital gains and losses each experienced in 1983 and subsequent years, to carry forward their portion of that loss. No adjustment to the partnership's returns was required to achieve this result.

In contrast, the reversal of 1983 income sought by MTH would require an adjustment to MTH's partnership returns not provided for in the settlement agreement. This income reversal does not arise as a matter of law from the disallowance of the 1982 interest expense deductions. Thus, there is no inconsistency between allowing individual partners to carry forward capital losses and rejecting MTH's attempt to add a third, unstated adjustment to the unambiguous express terms of the settlement agreement.

We have examined all of MTH's arguments and find them unpersuasive. We see nothing illogical in interpreting the settlement to include only the two adjustments expressly provided for in the agreement.

*Conclusion*

The decision of the tax court is reversed. The case is remanded to the tax court for entry of an order consistent with the foregoing.

---

**3.** Although the settlement made adjustments to the partnership's tax returns, no tax liability is determined at the partnership level. Rather, the effects of the settlement flow through to the partners who will ultimately report the income or claim the deductions on their individual returns.