148 F.3d 84
 Kalpana SHAH, Mehul Shah, Utpala M. Desai, Milind Sharad
Desai, Narendra R. Desai, Swati N. Desai, Plaintiffs,
Sadanand Singh, Individually and as Executor of the Estate
of Kala Singh, Deceased, Samir Singh, by and through
Sadanand Singh, Guardian Ad Litem, Kalpana Singh, by and
through Sadanand Singh, Guardian Ad Litem, Faraidoon
Oshtory, Manjula S. Patel, Sangita Patel, Nikita Patel,
Individually and as Heirs at Law to Surendra Patel,
Deceased, Bakul Shah, Anthony Father Anthony Theodore, Dilip
Parekh, Avani B. Shah, Rupal B. Shah, Aisha Begum, Mehboob
Kahn, Gayatri Dave, Gargi Dave, minors, by their Guardian Ad
Litem, Vinod Dave, Sanjay Patel, a minor, by and through his
Guardian Ad Litem, C.N. Patel, Ranjanben Patel, Jayshreeben
Patel, minors, by and through their Guardian Ad Litem,
Pravin Patel, Khanjan Dalal, Kalpesh Dalal, Deepali Desai,
Nagin Patel, Tara Patel, Satish Patel, Govind Patel,
Chotubhai Patel, Jamna Patel, Ganga Patel, Ajay Patel, a
minor, by and through his Guardian Ad Litem, Parvati Patel,
Parvati Patel, Plaintiffs-Appellants,
v.
PAN AMERICAN WORLD SERVICES, INC., Defendant,
Pan American World Airways, Inc., Alert Management, a
Florida Corporation, Does 1-50, Defendants-Appellees.
 Docket Nos. 97-7428(L), 97-7526(CON), 97-7556(CON),
97-7558(CON), 97-7562(CON), 97-7564(CON),
97-7566(CON), 97-7568(CON),
97-7572(CON), 97-7574(CON) and
97-7576(CON).
 United States Court of Appeals,
Second Circuit.
 Argued March 13, 1998.
Decided June 15, 1998.
 
 Reginald A. Vitek, Seltzer, Caplan, Wilkins & McMahon, San Diego, CA, for Singh Plaintiffs-Appellants.
 Daniel C. Cathcart, Magana, Cathcart & McCarthy, Los Angeles, CA, for non-Singh Plaintiffs-Appellants.
 Clinton H. Coddington, (Randolph S. Hicks, Richard G. Grotch, Coddington, Hicks & Danforth, Redwood City, CA, Arthur E. Hoffmann, Jr., Windels, Marx, Davies & Ives, New York City) for Defendants-Appellees.
 Before: CARDAMONE, WALKER and MAGILL,[1] Circuit Judges.
 WALKER, Circuit Judge:
 
 
 1
 Plaintiffs-appellants Sadanand Singh, et al., appeal from the March 24, 1997 judgment of the United States District Court for the Southern District of New York (John E. Sprizzo, District Judge ) after jury trial, entered pursuant to Fed.R.Civ.P. 50, 54(b), and 58, capping each appellant's recovery at $75,000 under the Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, TS No. 876 (1934), reprinted in 49 U.S.C.A. § 40105 (1997) ("Warsaw Convention" or "Convention"); dismissing various California State law claims brought by plaintiffs-appellants Sadanand Singh, individually and as executor of the Estate of Kala Singh, and Samir and Kalpana Singh, through a guardian ad litem (collectively, the "Singh plaintiffs"); and dismissing the Singh plaintiffs' motion, pursuant to 28 U.S.C. § 1404(a), to transfer venue to the Southern District of California for trial on the state claims and on Warsaw Convention claims relevant only to the Singh plaintiffs (collectively, the "non-common" claims). See Singh v. Pan American World Airways, Inc. (In re Hijacking of Pan American World Airways, Inc. Aircraft at Karachi Int'l Airport, Pakistan on Sep. 5, 1986), 920 F.Supp. 408, 415 (S.D.N.Y.1996) ("Karachi ").
 
 
 2
 This case arises out of the tragic September 1986 hijacking of Pan Am Flight 73 in Karachi, Pakistan, that led to approximately twenty deaths and numerous other injuries. The case presents the issue of whether fraudulent misrepresentation can constitute "wilful misconduct" within Article 25(1) of the Convention and, if it can, what causation as between the fraud and plaintiffs' damages is required. We also address the threshold question of whether the recent Supreme Court decision in Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998)--requiring cases transferred under 28 U.S.C. § 1407 to be remanded to the transferor courts at the conclusion of pre-trial proceedings--applies as a general matter to plaintiffs' actions and, if Lexecon does apply, whether it should apply retroactively in this case.
 
 
 3
 Affirmed.
 
 Background
 
 4
 In 1986, in response to public concern over terrorism on international airline flights, Pan American World Airways, Inc. ("Pan Am") contracted with Alert Management Systems, Inc. ("Alert") to provide a security system for its international flights. Pan Am thereafter advertised its Alert program, making various representations to the public about improved airport security that either had already been implemented or would be implemented by Pan Am. The Singh plaintiffs (but none of the other plaintiffs-appellants) allege that they saw Pan Am's advertisements and relied upon the representations of improved security therein in deciding to fly on Pan Am Flight 73. On September 5, 1986, Pan Am Flight 73 departed Bombay, India, en route to New York, New York, with a scheduled intermediary stop at Karachi International Airport in Karachi, Pakistan. While Flight 73 was on the ground at Karachi International Airport, armed hijackers drove a vehicle through a gate onto the airport tarmac, boarded the aircraft, and eventually opened gunfire on its passengers, killing some twenty passengers and injuring numerous others.
 
 
 5
 Plaintiffs-appellants are either passengers who were injured or representatives of passengers who were killed as a result of the hijacking. On February 23, 1987, the Singh plaintiffs filed an action against defendants in the Southern District of California asserting claims under the Warsaw Convention and California state law for the personal injury and death suffered on board Pan Am Flight 73. Numerous other actions relating to the hijacking of Pan Am Flight 73 were filed against Pan Am in various courts across the United States. With the exception of the action entitled Ganga Bahn v. Pan American World Airways, Inc., No. 87-CV-0547, all of these actions originated in courts other than the Southern District of New York ("Southern District") and in 1987 and 1988 were transferred by the multidistrict litigation panel ("MDL panel") to the Southern District for consolidated pre-trial proceedings under 28 U.S.C. § 1407. In December 1993, the Southern District granted Pan Am's motion to transfer and consolidate all of the actions for trial in that court.
 
 
 6
 On April 14, 1994, after a six-week jury trial of plaintiffs' Warsaw Convention claims, the jury returned a special verdict answering the following four questions:1) Do you find by a fair preponderance of the evidence that Pan Am[ ] engaged in wilful misconduct, as defined by the Court, in connection with the Alert Security Program?
 
 
 7
 The jury answered "yes."
 
 
 8
 2) Do you find by a fair preponderance of the evidence that Pan Am[ ] engaged in wilful misconduct, as defined by the Court, by flying into Karachi International Airport on September 5, 1986?
 
 
 9
 The jury answered "no."
 
 
 10
 3) If the answer to Question # 1 is Yes, do you find by a fair preponderance of the evidence that the wilful misconduct of Pan Am[ ], in connection with the Alert Security Program, was a proximate cause of the hijacking?
 
 
 11
 The jury answered "no."
 
 
 12
 4) If the answer to Question # 2 is Yes, do you find by a fair preponderance of the evidence that the wilful misconduct of Pan Am[ ], by flying into Karachi International Airport on September 5, 1986, was a proximate cause of the hijacking?
 
 
 13
 The jury did not answer.
 
 
 14
 The jury found therefore that defendants had not committed wilful misconduct by flying into Karachi, a claim common to all plaintiffs. It is not clear, however, why the district court submitted questions # 1 and # 3 to the jury as claims common to all of the plaintiffs, since defendants' alleged fraudulent misrepresentations could be relevant only to plaintiffs such as the Singh plaintiffs who, at minimum, were aware of defendants' advertisements about the Alert security program. Finally, the district court did not submit to the jury the question of whether defendants' inadequate security itself constituted wilful misconduct, in all likelihood because little if any evidence indicated that defendants had any power to control the level of security at Karachi International Airport.
 
 
 15
 On February 14, 1996, almost two years after the jury's verdict, the district court denied the Singh plaintiffs' motion, pursuant to 28 U.S.C. § 1404(a), to transfer back to the Southern District of California their remaining non-common California law claims and their fraudulent misrepresentation claim under the Convention. See Karachi, 920 F.Supp. at 415. The district court then dismissed the Singh plaintiffs' state claims as preempted by both the Warsaw Convention and the Airline Deregulation Act of 1978, 49 U.S.C. app. § 1305(a)(1) (1993), reconstituted in 49 U.S.C. § 41713(b)(1), and dismissed their fraudulent misrepresentation claim as barred by the jury's special verdict. Karachi, 920 F.Supp. at 414. On March 24, 1997, the district court entered final judgment, pursuant to Fed.R.Civ.P. 50, 54(b), and 58, awarding plaintiffs damages within the limitations imposed. It refused to award damages in excess of those limits because--as per the jury's special verdict--plaintiffs had failed to establish either defendants' wilful misconduct or the requisite causation between such misconduct and their damages.
 
 
 16
 Plaintiffs-appellants appeal from that judgment. In particular, the Singh plaintiffs contend that (1) notwithstanding the jury's special verdict, they are entitled to bring their fraudulent misrepresentation claim under the Convention, and (2) they are entitled to bring their California state law claims in addition to their Warsaw Convention claim. All of the plaintiffs-appellants also request a new trial on the basis that the district court's alleged misconduct during trial prejudiced the jury and that the court improperly refused to qualify as an expert one of plaintiffs' proffered witnesses.
 
 Discussion
 I. Remand Under 28 U.S.C. § 1407
 
 17
 We first address the threshold issue of whether the Supreme Court's recent decision in Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998), requires this court to vacate the district court's judgment as to all plaintiffs and remand all of the actions to the transferor courts from which the MDL panel transferred each action pursuant to 28 U.S.C. § 1407.
 
 
 18
 With the exception of Ganga Bahn, No. 87-CV-0547, all of the appellants' actions originated in courts other than the Southern District and were transferred in 1987 and 1988 to the Southern District by the MDL panel pursuant to 28 U.S.C. § 1407 (" § 1407"), which states:
 
 
 19
 When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings. Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions. Each action so transferred shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated....
 
 
 20
 (Emphasis added). In 1993, over the objections of all of the plaintiffs, defendants moved to transfer the actions to the Southern District for a consolidated liability trial, pursuant to 28 U.S.C. § 157(b)(5) (" § 157(b)(5)")--a bankruptcy statute--or alternatively, pursuant to 28 U.S.C. § 1404(a) (" § 1404(a)")--a general venue statute. On December 13, 1993, the district court granted defendants' motion to transfer "for the reasons stated at [the] Oral Argument" of December 10, 1993, but did not state whether it was relying on § 157(b)(5) or § 1404(a). The parties have not furnished a transcript of that oral argument and it is not a part of the record on appeal. A 1994 joint pre-trial order signed by the district court and lead counsel for both parties, however, states that "all actions have been transferred to [the Southern District], pursuant to Title 28 United States Code, § 1404(a), for the trial of all common liability issues," and therefore it appears that the district court did transfer the actions pursuant solely to § 1404(a). In 1994, following trial and prior to the district court's entry of judgment, the Singh plaintiffs moved, pursuant to § 1404(a), to transfer their action back to the Southern District of California--a motion denied by the district court in 1996. See Karachi, 920 F.Supp. at 415.
 
 
 21
 In Lexecon, the Supreme Court held that a district court to which cases have been transferred pursuant to § 1407 for pretrial proceedings cannot, after conclusion of the pretrial proceedings, transfer the case to itself for trial under § 1404(a). See 523 U.S. at ----, 118 S.Ct. at 959. Because the plain language of § 1407 dictates that "[e]ach action ... transferred [under § 1407] shall be remanded by the [MDL] panel at or before the conclusion of ... pretrial proceedings," 28 U.S.C. § 1407(a), the Court reasoned that "no exercise in rulemaking can read that obligation out of the statute." Lexecon, 523 U.S. at ----, 118 S.Ct. at 963.
 
 
 22
 Defendants respond with four arguments each of which, if accepted, could independently bar application of Lexecon: (1) that the district court transferred the action to itself for trial pursuant to § 157(b)(5) and not § 1404(a), and therefore Lexecon does not apply; (2) that even if the district court did transfer pursuant to § 1404(a), it could have transferred pursuant to § 157(b)(5) and, again, Lexecon would not apply; (3) that even if Lexecon is applicable as a general matter, it should not be applied retroactively in this case; and (4) that plaintiffs failed to preserve their Lexecon remand right by failing to request a remand under § 1407 or to object properly to the district court's transfer of venue.
 
 
 23
 A. Lexecon's Applicability to Section 157(b)(5)
 
 
 24
 We note first that the district court did transfer plaintiffs' action pursuant to § 1404(a) and not § 157(b)(5). Even assuming, however, that we may look to whether venue was sustainable under another legal basis such as § 157(b)(5), and assuming that venue in this action would have been sustainable under § 157(b)(5)--both issues as to which we express no opinion-it appears that Lexecon should apply to § 157(b)(5) transfers as well as to § 1404(a) transfers. Although Lexecon 's holding applies explicitly only to § 1404(a)--the only statute under which the transferee district court in that case purported to transfer venue--Lexecon 's reasoning applies equally to transfers pursuant to any venue statute. Lexecon recognizes that "no exercise in rulemaking can read ... out of the statute" the MDL panel's obligation to remand each action to its respective transferor court at or before the conclusion of pretrial proceedings. Id. (emphasis added). Lexecon does not preclude later consolidation of multiple suits for trial after they have first been returned to the district courts from which they came. "[O]n any view of § 1407(a), if an order may be made under § 1404(a), it may be made after remand of the case to the originating district court." Id. at ----, 118 S.Ct. at 964 (footnote omitted) (emphasis added). Indeed, Lexecon observes that § 1407
 
 
 25
 affects only the pretrial stages in multidistrict litigation. It would not affect the place of trial in any case or exclude the possibility of transfer under other Federal statutes [such as § 157(b)(5) ].... The subsection requires that transferred cases be remanded to the originating district at the close of coordinated pretrial proceedings.
 
 
 26
 Id. (quoting H.R.Rep. No. 90-1130, at 3-4 (1968), reprinted in 1968 U.S.C.C.A.N. 1898, 1900-01). Rather, posing "[t]he relevant question ... [of] whether a transferee court, and not a transferor court, may grant ... a motion [for transfer of venue]," the Court concluded that "self-assignment is beyond the scope of the transferee court's authority." Id.
 
 
 27
 We also note that Lexecon is not premised upon the belief that § 1404(a) does not itself permit self-transfer (whereas, as defendants may claim, § 157(b)(5) does). Lexecon explicitly leaves unresolved the issue of whether § 1404(a) permits self-transfer See id. at ---- n. 4, 118 S.Ct. at 964 n. 4. In short, Lexecon and § 1407 require that the MDL panel remand to the transferor court any action "at or before the conclusion of ... pretrial proceedings," and any further transfers of venue for trial under any statute must follow such remand. Whether, after remand to the transferor court, a court has the power to transfer venue to itself under § 1404(a) or § 157(b)(5) is a separate issue that we have no need to decide.
 
 B. Retroactivity of Lexecon
 
 28
 We next turn to whether Lexecon should be applied retroactively in this case.
 
 
 29
 When [the Supreme Court] applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule.
 
 
 30
 Harper v. Virginia Dep't of Taxation, 509 U.S. 86, 97, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993). Harper, however, did not require retroactive application where the Supreme Court explicitly " 'reserve[s] the question whether its holding should be applied to the parties before it.' " Id. (quoting James B. Beam Distilling Co. v. Georgia, 501 U.S. 529, 539, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991)). Lexecon is such a case. Responding to respondent's nonretroactivity argument, the Court concluded that it was "unnecessary for [it] to consider" that issue because it was not presented to the lower courts or in opposition to the certiorari petition. See Lexecon, 523 U.S. at ---- n. 5, 118 S.Ct. at 965 n. 5. The Court then remanded the case for further proceedings. We therefore apply the three-factor retroactivity analysis of Chevron Oil Co. v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971):
 
 
 31
 First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied or by deciding an issue of first impression whose resolution was not clearly foreshadowed. Second, ... we must ... look[ ] to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation. Finally, we have weighed the inequity imposed by retroactive application, for where a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the injustice or hardship by a holding of nonretroactivity.
 
 
 32
 Id. at 106-07, 92 S.Ct. 349 (citations and quotation marks omitted).
 
 
 33
 Because Lexecon "reverse[d] the longstanding practice under [§ 1407]," 523 U.S. at ----, 118 S.Ct. at 962; see, e.g., Pfizer, Inc. v. Lord, 447 F.2d 122, 122-25 (2d Cir.1971), it is unquestionable that Lexecon "overrul[ed] clear past precedent on which litigants may have relied." Second, retrospective application of Lexecon would frustrate the "esential [sic] purpose of section 1407 to 'promote the just and efficient conduct' of complex multidistrict litigation." Pfizer, 447 F.2d at 125 (quoting 28 U.S.C. § 1407(a)); see Crown, Cork & Seal Co. v. Parker, 462 U.S. 345, 353, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983) (section 1407 is one method "by which the burdens of multiple lawsuits may be avoided"). In the instant case, this primary concern outweighs the subsidiary concern of § 1407 to "favor ... [the] plaintiff's choice of forum." Lexecon, 523 U.S. at ----, 118 S.Ct. at 960. In 1993, the transferee district court transferred the actions to itself for trial; in 1994, that court held a six-week jury trial; and Lexecon was not decided until March 1998, nearly a year after the judgment of the district court and ten days before oral argument in this court. Retroactive application of Lexecon would require remand of each action to its respective transferor court, with the possibility that some or all of the actions will not be re-transferred to the Southern District. If this should happen, the jury's special verdict will be of no effect as to some or all of the actions, which would then have to be retried, possibly separately. Retroactive application could therefore lead to an enormous waste of judicial resources, precisely the result Congress sought to avoid by enacting § 1407. At least when a trial has been completed and final judgment has been entered, as in the instant case, the second Chevron factor weighs heavily in favor of non-retroactive application.
 
 
 34
 As to the third Chevron factor, which weighs the equities of retroactive application, the Supreme Court has recently observed that "we can scarcely permit 'the substantive law [to] shift and spring' according to 'the particular equities of [individual parties'] claims' of actual reliance on an old rule and of harm from a retroactive application of the new rule." Harper, 509 U.S. at 97, 113 S.Ct. 2510 (alterations in original) (quoting Beam, 501 U.S. at 543, 111 S.Ct. 2439). This factor may therefore be of little, if any, effect. Assuming that the third factor is no longer valid, we easily hold that the first two Chevron factors in this case preclude Lexecon 's retroactive application. To the extent that the third Chevron factor still has force, the equities still favor not applying Lexecon in this case. After twelve years of litigation, the parties have an interest in resolution of the fundamental issues in this case and, if we so decide, a final judgment from this court.
 
 
 35
 Because we hold that Lexecon does not apply retroactively to the instant action, we do not address whether either the Singh or the non-Singh plaintiffs waived their right to a remand under § 1407. See Lexecon, 523 U.S. at ---- n. 1, 118 S.Ct. at 962 n. 1.
 
 II. Warsaw Convention Claim
 
 36
 We next turn to the merits of appellants' Warsaw Convention claim. The Convention applies "to all international transportation of persons, baggage, or goods performed by aircraft for hire," Convention, art. 1, and governs the liability of international air carriers for damages resulting from an "accident," Convention, art. 17, which has been interpreted to include hijacking or terrorist activity. See Pflug v. Egyptair Corp., 961 F.2d 26, 29 (2d Cir.1992). Under Article 17 of the Convention,
 
 
 37
 [t]he carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.
 
 
 38
 Article 22 of the Convention, as modified by the Montreal Agreement,[2] limits the liability created by Article 17 "for each passenger for death, wounding, or other bodily injury [to] $75,000 inclusive of legal fees and costs, except that, in case of a claim brought in a State where provision is made for separate award of legal fees and costs, the limit [shall be] $58,000 exclusive of legal fees and costs." Defendants have conceded liability and the district court entered judgment against defendants for damages within the limits prescribed by Article 22 as modified.
 
 
 39
 Article 25(1) of the Convention as translated, however, provides that
 
 
 40
 [t]he carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability, if the damage is caused by his wilful misconduct or by such default on his part as, in accordance with the law of the court to which the case is submitted, is considered to be equivalent to wilful misconduct.
 
 
 41
 The Singh plaintiffs claim that the district court improperly capped defendants' liability to the limits prescribed by Article 22 as modified because defendants' misrepresentations on the subject of improved airport security constitute "wilful misconduct" within Article 25(1) and caused them damage. This claim, sharply contested by defendants, is a principal issue of this appeal.
 
 
 42
 A. Fraudulent Misrepresentation as "Wilful Misconduct"
 
 
 43
 As a preliminary matter, defendants maintain that the district court erred when it held that fraudulent misrepresentation by an air carrier can itself constitute "wilful misconduct" within Article 25(1) of the Convention. Defendants claim that such a holding "transform[s] the Convention into an international agreement that imposes liability on air carriers for allegedly false or fraudulent advertising," and undermines the desired uniformity of the Convention's liability scheme by "allow[ing] those passengers who have 'relied' on fraudulent advertising to recover amounts in excess of the generally applicable limits of the Convention, while other passengers who suffered equal or greater injuries in the same accident would not." The Singh plaintiffs respond that the Convention was not designed to "insulate an airline from the consequences of its own fraud," and that "where the wilful misconduct consists of fraudulent statements made before the flight to lure passengers onto the aircraft, it is only logical that the misconduct can affect different passengers differently, and that they may have different claims based on their individual circumstances."
 
 
 44
 "Wilful misconduct under the Convention means that a carrier must have acted either 1) with knowledge that its actions would probably result in injury or death, or 2) in conscious or reckless disregard of the fact that death or injury would be the probable consequence of its actions." Pagnucco v. Pan American World Airways, Inc. (In re Air Disaster at Lockerbie Scotland on Dec. 21, 1988 ), 37 F.3d 804, 812 (2d Cir.1994) ("Lockerbie II ").[3] The district court defined wilful misconduct for the jury as making false statements either knowingly or "with no basis in fact or with reckless disregard of the truth" and with awareness that defendants' "fail[ure] to act in the way they promised to do" was "likely to cause injuries to passengers." See Trial Tr. at 2750, 2762. It is unclear to us why, as defendants contend, fraudulent misrepresentations as to the state of an airline's security should enjoy unique status as non-wilful misconduct within Article 25. Indeed, we recognized such wilful misconduct in Lockerbie II, 37 F.3d at 822 (admitting, as proof of misconduct, "proof regarding the 'Alert' Security Program reveal[ing] first, that it was neither related to security, nor was it a program. Instituted by Pan Am in May 1986 during a period of sharp decline in international travel due to terrorist attacks, the program was a misleading public relations ploy designed to make would-be travelers feel more secure."). The Convention's uniformity principle, moreover, plainly does not require equal treatment of all passengers injured by an aviation accident where only a subset of those passengers were injured as a result of the carrier's wilful misconduct--here, Pan Am's fraudulent misrepresentations.
 
 B. Causation
 
 45
 Our conclusion that fraudulent misrepresentation can constitute "wilful misconduct" leads to the much more difficult question of what causal nexus must be shown between the misrepresentation and plaintiffs' damages. We therefore determine first, the proper standard for causation under the Convention and second, whether the jury's special verdict precludes a finding of causation under that standard.
 
 
 46
 (1) Proper Standard of Causation. Article 25 of the Convention which, as noted, removes the liability limitation of Article 22, speaks only generally to causation: liability exists where the plaintiffs' "damage is caused by [the carrier's] wilful misconduct." Challenged to find the test for causation in fraudulent misrepresentation cases, a matter the Convention leaves unresolved, the Singh plaintiffs suggest a winding path to that conclusion. They argue that, in the absence of a prescribed test for causation in fraudulent misrepresentation cases, the Convention derogates that issue to another source of law--here United States law, see Zicherman v. Korean Air Lines Co., 516 U.S. 217, 227-28, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996); that Zicherman forbids creation of a federal common-law rule of causation, see id. at 230-31, 116 S.Ct. 629; that, in the absence of federal statute, the controlling law (including choice of law rules) is that of the forum jurisdiction, see Brink's Ltd. v. South African Airways, 93 F.3d 1022, 1030 (2d Cir.1996), cert. denied, 519 U.S. 1116, 117 S.Ct. 959, 136 L.Ed.2d 845 (1997); that where there has been a change of venue, the forum jurisdiction is where the action has been filed--here the Southern District of California, see Van Dusen v. Barrack, 376 U.S. 612, 639, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964); that California's choice of law rules therefore determine which substantive law applies, see Valley Juice Ltd. v. Evian Waters of France, Inc., 87 F.3d 604, 607 (2d Cir.1996); that under California's "governmental interests" approach to choice of law rules, California law would apply, see Reich v. Purcell, 67 Cal.2d 551, 555-56, 63 Cal.Rptr. 31, 432 P.2d 727 (1967); and that California law prescribes a causal nexus between wilful misconduct and damages that is weaker than the causation test used by the district court. See Garcia v. Superior Court of Santa Clara County, 50 Cal.3d 728, 737, 268 Cal.Rptr. 779, 789 P.2d 960 (1990). We disagree.
 
 
 47
 Article 24 of the Convention states that any action for damages under Article 17 "can only be brought subject to the conditions and limits set out in this convention." Convention, arts. 24(1), 24(2). We believe that this means that unless the Convention reserves an issue for determination by the law of another jurisdiction, the law of the Convention--not federal common law, state law, or any other law of the forum court--applies. Unlike in this case, the Convention articles at issue in both Zicherman and Brink's suggested that the critical questions in those cases were to be decided according to the law of other fora. In determining whether loss of society damages, resulting from the death of a relative in a plane crash on the high seas, were recoverable, Zicherman looked to Article 24(2), which states that Article 24 applies "without prejudice to the questions as to who are the persons who have the right to bring suit and what are their respective rights." Zicherman, 516 U.S. at 224-25, 116 S.Ct. 629. Zicherman therefore concluded that "the law of the Convention does not affect the substantive questions of who may bring suit and what they may be compensated for," and looked to United States law to determine the result. Id.; see also Pescatore v. Pan American World Airways, Inc., 97 F.3d 1, 8 (2d Cir.1996). Similarly, in determining whether theft by an employee acting within the scope of employment constitutes "wilful misconduct," Brink's looked to the law of the forum jurisdiction, as contemplated by the specific language of Article 25(1), which applies to "wilful misconduct or [ ] such default ... as, in accordance with the law of the court to which the case is submitted, is considered to be equivalent to wilful misconduct." See Brink's, 93 F.3d at 1028-29.
 
 
 48
 The Convention "was intended to serve as a uniform, international law" and one of its central purposes was "to establish uniformity in the aviation industry with regard to ... the substantive law applicable" to claims "arising out of international transportation." Rein v. Pan American World Airways Inc. (In re Air Disaster at Lockerbie, Scotland on Dec. 21, 1988 ), 928 F.2d 1267, 1270, 1280 (2d Cir.1991) ("Lockerbie I ") (quotation marks omitted). Unless otherwise indicated by the Convention, application of various rules of substantive law on the same question, depending on the state in which an action was brought and that state's choice of law rules, tends to undermine the Convention's uniformity principle. Because no provision of the Convention suggests that the issue of causation should be decided according to the law of another jurisdiction, we look to "the conditions and limits set out in this convention." Convention, art. 24(1).
 
 
 49
 The issue of the standard of causation applicable in fraud-based "wilful misconduct" cases under the Convention is apparently one of first impression in the United States. In interpreting the Convention, we therefore "begin with the text of the treaty and the context in which the written words are used," and if necessary to "ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties." Eastern Airlines, Inc. v. Floyd, 499 U.S. 530, 534-35, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991) (quotation marks omitted).
 
 
 50
 Article 25 of the Convention, as translated, applies where the plaintiffs' "damage is caused by [the carrier's] wilful misconduct." Where fraudulent misrepresentation constitutes the "wilful misconduct," the causation language of Article 25 is susceptible to three interpretations. First, to the extent a plaintiff reasonably relies on a misrepresentation and is thereby induced to board an airplane that is hijacked--leading plaintiff to suffer injury--the misrepresentation could be said to have "caused" plaintiff's injury, or "damage." We believe that this "but for" or "factual" causation is insufficient to establish the causation required by Article 25. It cannot credibly be maintained, for example, that where a plaintiff reasonably relies upon an airline's fraudulent misrepresentations of good meals, padded seats, and ample leg room and the plaintiff's plane is then hijacked and the plaintiff injured, that the misrepresentation--by causing the plaintiff to board the plane--in any way "caused" plaintiff's injuries as defined by Article 25. At oral argument, the Singh plaintiffs conceded the untenability of such a factual causation theory.
 
 
 51
 A second interpretation--the one urged by the Singh plaintiffs on appeal--would define causation as both reasonable reliance on the misrepresentation inducing passengers to use a carrier and a reasonable relationship between the injuries and the representations relied upon. Because the Singh plaintiffs were allegedly induced by Pan Am's misrepresentations of improved security to fly Pan Am and because one of the purposes of such security was to prevent hijackings such as the one that caused plaintiffs' injuries, the Singh plaintiffs contend that Pan Am's misrepresentations "caused" their damage. If, however, Pan Am's institution of the Alert program as promised would not have prevented the hijacking of Pan Am Flight 73, then the representation cannot have "caused" plaintiffs' injuries any more than the failure to serve a promised meal under the first interpretation, and any "reasonable relationship" between the representations and the injuries would be purely coincidental. The Convention's "clearly [ ] overriding purpose--to limit air carriers' potential liability in the event of accidents," see Lockerbie I, 928 F.2d at 1270, would be undermined if air carriers were held liable for damages that would have occurred regardless of whether or not the carrier's representations of improved security were ultimately performed as promised. We therefore reject this second, "reasonable relationship" formulation of causation as well. Rather, we believe that to establish Article 25(1) causation for fraud-based wilful misconduct claims, the Convention requires plaintiffs to prove by a preponderance of the evidence first, that their reasonable reliance on the fraudulent misrepresentations induced them to use the carrier and second, that the damages would not have occurred if the carrier had performed as promised. In the instant case, therefore, defendants would not be liable under Article 25(1) if, assuming they had instituted the Alert security program as represented to the Singh plaintiffs, the hijacking would still have occurred.
 
 
 52
 (2) The Jury's Special Verdict. Our next inquiry is whether the special verdict form and jury charge properly applied the test elucidated above, in which case the jury's special verdict would dispose of the causation issue and require dismissal of the Singh plaintiffs' Warsaw Convention claims. "The formulation of special verdict questions rests in the sound discretion of the trial judge, and should be reviewed by an appellate court only for an abuse of that discretion." Vichare v. AMBAC Inc., 106 F.3d 457, 465 (2d Cir.1996). "Reversal is warranted if the questions mislead or confuse the jury, or if they inaccurately frame the issues to be resolved by the jury." Id. However, the court's special verdict questions "must be read in conjunction with the judge's charge to the jury." Id. at 466.
 
 
 53
 The special verdict form in the instant case asked the question: "[D]o you find by a fair preponderance of the evidence that the wilful misconduct of Pan American World Airways, Inc., in connection with the Alert Security Program, was a proximate cause of the hijacking?" to which the jury answered "no." This somewhat ambiguous special verdict form--asking whether the wilful misconduct in connection with the Alert program proximately caused the hijacking--could have left some room for misinterpretation by the jury. An advertising program plainly cannot "cause" a hijacking and it is not inconceivable that the jury could have rejected a finding of causation on this basis. The special verdict form should have asked: "Had Pan Am instituted the security as promised in its Alert Security Program, would the hijacking--and therefore plaintiffs' injuries--have occurred?"
 
 
 54
 However, the district court's jury charge as to causation stated:
 
 
 55
 Proximate cause means that the willful misconduct of Pan Am was a substantial contributing factor in bringing about the hijacking.... Obviously we know that the conduct of the hijackers caused the hijacking to a large extent. So the plaintiffs do not have the burden of proving that the willful misconduct of Pan Am was the sole cause of the accident.... [I]f this hijacking would have occurred in any event regardless of whether Pan Am was guilty of willful misconduct or not, then proximate cause would not be shown.... If it was not a contributing factor in the sense that even if the willful conduct had not taken place, the hijacking would have happened anyway, ... that even if all the security arrangements had been put in place as represented by Pan Am, even if they had done everything they said they were supposed to do, the hijacking would have occurred anyway, then plaintiffs would not have carried the burden of showing that it is a proximate cause.
 
 
 56
 Trial Tr. at 2763-64 (emphasis added). This jury charge did clarify the special verdict form by stating that the jury could not find causation if "the hijacking would have occurred" "even if all the security arrangements had been put in place as represented by Pan Am, even if they had done everything they said they were supposed to do." In light of plaintiffs' failure to request a more precise charge consistent with our earlier discussion of the law, their failure to object to the district court's proposed special verdict form, see Trial Tr. at 2543-44, and their concession before the district court that in fact the jury was "asked whether or not [the hijacking] would have happened if [defendants] did everything that was promised," Tr., March 10, 1995, at 11, we find that the jury instructions, taken as a whole, were not sufficiently misleading or ambiguous as to constitute plain error. See United States v. Ciak, 102 F.3d 38, 45 (2d Cir.1996) (applying plain error review where party failed to object to jury charge). In the context of the jury instructions that were given, the jury's special verdict precludes any finding of causation as to the Singh plaintiffs' fraudulent misrepresentation claim under the Warsaw Convention.
 
 
 57
 C. "Causes" v. "Arises From"
 
 
 58
 The Singh plaintiffs also challenge the district court's special verdict form and jury charge on the theory that the Article 25(1) causation test in the official American and British translations of the Warsaw Convention is mistranslated and improperly requires a stronger nexus between wilful misconduct and damage than does the test as set out in the original French text. The Singh plaintiffs note, correctly, that "[b]ecause the only authentic text of the Warsaw Convention is in French, the French text must guide our analysis." Eastern Airlines, 499 U.S. at 535, 111 S.Ct. 1489. The official French text of Article 25(1) reads: "si le dommage provient de son," which the Singh plaintiffs claim to mean "if the damage arises out of " and not "if the damage is caused by" the wilful misconduct. They note further that Article 17, which in the American translation establishes carrier liability where an "accident ... caused the damage," reads "cause le dommage" in the official French text. After the jury returned its special verdict, the Singh plaintiffs presented to the district court the uncontroverted declaration of their French legal expert, Professor Alain Levasseur, that "provient de son" means "arises from" in the context of Article 25(1). The Singh plaintiffs maintain that because, under the proper translation of Article 25(1), their damages would only have to "arise from" Pan Am's fraudulent misrepresentation, the jury's special verdict as to causation does not now preclude their fraudulent misrepresentation claim.
 
 
 59
 Defendants respond that, because Article 17--creating the carrier's liability--requires proximate cause, plaintiffs' reading of Article 25 is illogical because it would "allow recovery of unlimited damages for an act of wilful misconduct that could not, in the first instance, have supported a finding of liability under Article 17." This argument misses the fact that Article 17 requires proximate causation as between the "accident " and plaintiffs' "damage," while Article 25, under plaintiffs' reading, would require the looser "arising from" causation only as between defendants' "wilful misconduct " and plaintiffs' "damage." (Emphasis added). This interpretation appears to reconcile the inconsistent standards of causation by attributing them to differing levels of culpability.
 
 
 60
 Defendants next observe that no United States court has ever questioned the American/British translation of Article 25(1) as it relates to causation. "Age [, however,] is no antidote to clear inconsistency with a statute," or a treaty. Lexecon, 523 U.S. at ----, 118 S.Ct. at 962 (quoting Metropolitan Stevedore Co. v. Rambo, 515 U.S. 291, 300, 115 S.Ct. 2144, 132 L.Ed.2d 226 (1995)). Defendants note, finally, that Article 25(2), which as translated states that a carrier may not avail itself of liability limitations "if the damage is caused [by the wilful misconduct of] any agent of the carrier acting within the scope of his employment," reads "a ete cause" in the original French text. (Emphasis added). Defendants reason that the Convention did not contemplate "different standards of causation ... depending on whether the party engaging in wilful misconduct [was] the air carrier itself or its agent."
 
 
 61
 We note that the Singh plaintiffs' translation error argument logically applies not just to fraudulent misrepresentation but to all wilful misconduct claims. Because plaintiffs did not object to the jury charge or special verdict form on this ground until after the jury's special verdict, however, we do not resolve this translation error issue except to hold--upon the limited record before us--that the district court's instructions were not plain error. Plaintiffs' argument based on the French text, while not without substance, is one that the district court could not have anticipated given the state of the law. See Ciak, 102 F.3d at 45 (applying plain error review where party failed to object to jury charge). Plaintiffs' own requested jury charge asked "whether the wilful misconduct was a proximate cause of the hijacking and the injuries and deaths of the passengers," and their requested special verdict form asked whether Pan Am's wilful misconduct was "a cause" of plaintiffs' damages. We therefore leave to another day whether "provient de son" in Article 25(1) is properly translated as "is caused by" or "arises from," (and, if the latter, its significance), an issue of apparent first impression in this country.
 
 III. State Law Claims
 
 62
 The Singh plaintiffs' common law claims for rescission, negligence, wrongful death, conspiracy to defraud, breach of contract, and fraud are all preempted by the Warsaw Convention. It is now well-established that "[a]ll state law claims that fall within the scope of the Convention are preempted." Fishman v. Delta Air Lines, Inc., 132 F.3d 138, 141 (2d Cir.1998) (citing Lockerbie I, 928 F.2d at 1273); see Coker v. Pan American World Airways, Inc. (In re Pan American Corp.), 950 F.2d 839, 847 (2d Cir.1991) (transferee court in Second Circuit must apply preemption law as construed by the Second Circuit). This is because the Convention
 
 
 63
 had two primary goals: first, to establish uniformity in the aviation industry with regard to the procedure for dealing with claims arising out of international transportation and the substantive law applicable to such claims ... [and] second--clearly the overriding purpose--to limit air carriers' potential liability in the event of accidents.
 
 
 64
 Lockerbie I, 928 F.2d at 1270 (quotation marks omitted). Moreover, "[t]he existence of the state causes of action would not only result in the inconsistent application of law to the same accident, but also would cause enormous confusion for airlines in predicting the law upon which they would be called to respond." Id. at 1276. All of the Singh plaintiffs' common law claims are "within the scope" of Article 17 of the Convention, in that they all seek damages for "the death or wounding of a passenger or any other bodily injury suffered by a passenger" caused by an "accident ... on board [an] aircraft" in international transportation. Convention, arts. 1, 17; see Fishman, 132 F.3d at 141.
 
 
 65
 Because all of the Singh plaintiffs' common law claims are preempted by the Warsaw Convention, we have no need to address the second arrow in defendants' preemption quiver: the questionable contention that somehow all of plaintiffs' state claims implicate state laws or regulations "having the force and effect of law relating to rates, routes, or services of any air carrier," and are therefore preempted by the Airline Deregulation Act of 1978, 49 U.S.C. app. § 1305(a)(1) (1993), reconstituted in 49 U.S.C. § 41713(b)(1). See generally American Airlines, Inc. v. Wolens, 513 U.S. 219, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995); Morales v. Trans World Airlines, Inc., 504 U.S. 374, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992).
 
 IV. Challenge to the Trial Judge's Conduct
 
 66
 All of the plaintiffs argue that the trial judge committed reversible error by improperly questioning witnesses before the jury. In reviewing a challenge to a trial judge's conduct, we determine not "whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid[, but] ... whether the judge's behavior was so prejudicial that it denied [a party] a fair, as opposed to a perfect, trial." United States v. Rosa, 11 F.3d 315, 343 (2d Cir.1993) (quotation marks omitted). Our statement of this legal standard in no sense should be taken to detract from our counsel that, of course, "a court must strive for 'that atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding,' " Santa Maria v. Metro-North Commuter R.R., 81 F.3d 265, 273 (2d Cir.1996) (quoting Glasser v. United States, 315 U.S. 60, 82, 62 S.Ct. 457, 86 L.Ed. 680 (1942)), and "must be especially cautious and circumspect in language and conduct during a jury trial." Id. (quotation marks omitted). Although "asking numerous and probing questions of witnesses" is "unquestionably proper," a "trial judge should limit questioning to inquiries necessary to clarify ambiguities, correct misstatements, or obtain information necessary to make rulings," United States v. Manko, 979 F.2d 900, 905 (2d Cir.1992), and "[w]e will reverse on the basis of a judge's improper remarks if the judge expresses [his] opinion on an ultimate issue of fact in front of the jury or [argues] for one of the parties." Causey v. Zinke (In re Aircrash in Bali, Indonesia ), 871 F.2d 812, 815 (9th Cir.1989) (alteration in original) (quotation marks omitted). "[I]t is only after an examination of the entire record," however, "that we can come to a conclusion about the conduct of the district court." Manko, 979 F.2d at 905-06 (quotation marks omitted).
 
 
 67
 Of the many examples cited by plaintiffs, the trial judge's conduct in the jury's presence was troublesome only in the judge's questioning of plaintiffs' principal airport security expert, Isaac Yeffet, a former head of El Al security, as follows:THE COURT: Do you have an opinion as to what the state of security was at Karachi Airport on September 5, 1986?
 
 
 68
 THE WITNESS: Yes, sir.
 
 
 69
 THE COURT: What is that opinion?
 
 
 70
 THE WITNESS: That if terrorists--
 
 
 71
 THE COURT: No, no, what is that opinion--not if, not hypothetically what could happen--as to the state of security at that airport?
 
 
 72
 THE WITNESS: That they cannot near the aircraft stop terrorists who is [sic] coming to attack or to hijack the aircraft.
 
 
 73
 THE COURT: That is not an opinion. That is just your statement that they couldn't prevent what happened.
 
 
 74
 THE WITNESS: That's right.
 
 
 75
 THE COURT: I take it you have very good security on the West Bank, isn't that correct, in Israel?
 
 
 76
 THE WITNESS: Yes, your Honor.
 
 
 77
 THE COURT: Troops all over the place?
 
 
 78
 THE WITNESS: Yes.
 
 
 79
 THE COURT: Somebody went into a mosque and shot 60 people. So what I am saying to you is, I ask you for your opinion of the nature of security. Was it good, bad, or indifferent? That is what I want to know. That is what they need to know.
 
 
 80
 THE WITNESS: Your Honor, very bad.
 
 
 81
 Trial Tr. at 1057-58. The trial judge's reference to the Hebron massacre,[4] while arguably a legitimate effort to draw a proper expert opinion from Yeffet, could also have improperly suggested to the jury that, if "very good security on the West Bank" could not prevent the Hebron massacre, then the Pan Am hijacking would have occurred even had Pan Am fulfilled its promises of improved security. The trial judge compounded this error when, in response to Yeffet's contention that Pan Am should have had more armed guards surrounding the plane on the tarmac, the district court stated:
 
 
 82
 THE COURT: [Y]ou are an expert in this field, but I have flown and I am sure other people have flown. I don't have any recollection of having seen armed guards in most of the airplanes I have flown in that are flown by airlines. What I am asking you is this: As of September 5, 1986, was it common practice for airlines at that time to have armed guards, their own paid armed guards in the terminal, in the airport?
 
 
 83
 THE WITNESS: They had armed guards--
 
 
 84
 THE COURT: But were they employed by the airlines or were they soldiers?
 
 
 85
 THE WITNESS: No, they were from the local authorities, and some of them that had air marshals, they were on the spot until their aircraft took off.
 
 
 86
 THE COURT: But would it be fair to say that most airlines at September 5, 1986, did not employ armed guards to patrol the airline terminals? Is that true?
 
 
 87
 THE WITNESS: I cannot say most of them employed. But I can say that the local authorities, with the cooperation with the head of security of those airlines, they provide them armed guards to secure their flight.
 
 
 88
 THE COURT: But normally the armed guards, the people who patrol the terminals, are supplied by the local military authorities or local civilian authorities?
 
 
 89
 THE WITNESS: Correct.
 
 
 90
 THE COURT: At least that is what I have seen, and tell me if I am right.
 
 
 91
 THE WITNESS: You are correct.
 
 
 92
 Id. at 1062-63. Apparently disbelieving Yeffet's expert opinion that Pan Am should have employed armed guards and that such armed guards may have prevented the hijacking, the trial judge continued to question Yeffet during plaintiffs' direct examination:
 
 
 93
 THE COURT: What I am saying to you is--and I have asked you the question five times and I have gotten the same answer all five times--the one thing you say Pan Am should have had was more armed guards--at least five, as I heard your testimony.THE WITNESS: Yes, your Honor, upwards of six.
 
 
 94
 THE COURT: How long would it take a hijacker with a machine gun to dispatch five armed guards?
 
 
 95
 THE WITNESS: What do you mean to dispatch?
 
 
 96
 THE COURT: Shoot them.
 
 
 97
 THE WITNESS: All this action is a question of seconds.
 
 
 98
 THE COURT: I know.
 
 
 99
 THE WITNESS: Now, if I have armed guard professionals, some of them with uniforms, some of them without uniforms, and they are aware why they are in the position, once the terrorists are coming with their car, they might kill one or two, but we still have professional armed guards to give the answer to kill the four terrorists.
 
 
 100
 THE COURT: It depends how good they are. If they are as good as these highly trained, specialized commando types that El Al employs, I guess you have one scenario. But if they are ordinary soldiers, you have another?
 
 
 101
 THE WITNESS: They [the security persons at Karachi] are not even soldiers, your Honor.
 
 
 102
 THE COURT: But these people testified that they are highly trained commando types, are they not?
 
 
 103
 THE WITNESS: When any other airlines decides [sic] already to have armed guards--
 
 
 104
 THE COURT: I think I have your opinion.
 
 
 105
 Id. at 1069-70. The trial judge's own experiences with airlines and his opinion as to whether El Al commandos or ordinary soldiers would have prevented the Pan Am hijacking are plainly of no relevance to the jury. We cannot say that the above colloquies reflected "questioning [limited] to inquiries necessary to clarify ambiguities, correct misstatements, or obtain information necessary to make rulings," Manko, 979 F.2d at 905, and indeed they approach the tone of a cross-examination on behalf of defendants. Moreover, the trial judge's questioning went to the issue of causation, upon which the jury ultimately found in favor of defendants. During the six-week trial and many thousands of pages of testimony, however, the district court did not otherwise engage in improper questioning in front of the jury. Although a very close issue, upon "examination of the entire record" in this particular case, see Manko, 979 F.2d at 905-906, and given the trial judge's otherwise proper conduct in front of the jury throughout the entire six-week trial, we decline to vacate the judgment of the district court based upon the trial judge's questioning of Yeffet.
 
 
 106
 Plaintiffs also point to a number of remarks made by the trial judge to counsel out of the jury's presence as evidence of the district court's bias against plaintiffs. For example, after the trial judge forbade one of the plaintiff's lawyers from speaking and suggested that he go to "a trial practice school," the judge stated to another plaintiff's lawyer:
 
 
 107
 THE COURT: If you want to improve his career, tell the firm to send him to a trial practice seminar so he learns something about the rudiments of asking a question, the rudiments of what arguments to make to a judge, what arguments not to make to a judge....
 
 
 108
 [COUNSEL]: I don't want to focus on a narrow issue. I understand what you are saying. I understand. I have heard it.
 
 
 109
 THE COURT: He doesn't know how to try a case, in my view.
 
 
 110
 [COUNSEL]: I want you to know that, with my experience and my confidence in [plaintiffs' counsel], nothing has been done to undermine that confidence in him.
 
 
 111
 THE COURT: That may be. That may only prove that you are more obdurate than you should be. Frankly, when I was a partner at a law firm, I took criticisms of federal judges more seriously than that and I paid more attention to it, which is probably why I learned more than you did. The fact of the matter is that if a federal judge with my trial experience and my judicial experience and my record as a practicing lawyer before I came here, if that opinion is so unimportant to you, maybe that explains why he is as bad as he is.
 
 
 112
 Trial Tr. at 2780-82. Other similar comments, also outside the jury's presence, are cited by the plaintiffs.
 
 
 113
 To be sure, the foregoing remarks are tough medicine, not of the sort an attorney likes to hear, and perhaps their message--that the trial attorney's performance was below par and in serious need of improvement--could have been conveyed in a less acerbic manner. If the remarks had been made in the jury's presence, we would be concerned that they might have been taken by the jury as reflecting an opinion by the judge on the merits of plaintiffs' case. But the jury did not hear them and we will not second-guess the trial judge's belief that the attorney's performance warranted the rebuke. In our view, the remarks are indicative not of judicial bias, but rather of the judge's legitimate concern over the attorney's performance at trial. Because the remarks were made outside of the jury's presence and did not otherwise impede the fairness of the proceedings, they did not influence or prejudice the trial in any way, and we therefore decline to vacate the district court's judgment on that basis. Cf. Santa Maria, 81 F.3d at 275 (ordering new trial because of trial judge's prejudicial comments in jury's presence).
 
 V. Expert Witness
 
 114
 Finally, all of the plaintiffs claim that the district court's refusal to qualify plaintiffs' proffered perimeter security expert--Gary Stubblefield--was an abuse of that court's discretion. "The admission or exclusion of expert testimony rests soundly in the broad discretion of the trial court." Lockerbie II, 37 F.3d at 824; see General Elec. Co. v. Joiner, 522 U.S. 136, ----, 118 S.Ct. 512, 517, 139 L.Ed.2d 508 (1997) (same). Stubblefield had never been a security officer with an American commercial airport or American airline, had never performed a threat assessment of an airport, had performed no recent consulting work, and had received no training with respect to airport or airline security. In these circumstances, we cannot say that the district court abused its discretion in refusing to qualify Stubblefield as an expert.
 
 Conclusion
 
 115
 We affirm the judgment of the district court for the reasons set forth above. Each party shall pay its own costs.
 
 
 
 [1]
 The Honorable Frank J. Magill, of the United States Court of Appeals for the Eighth Circuit, sitting by designation
 
 
 [2]
 The Montreal Agreement, otherwise known as the Agreement Relating to Liability Limitations of the Warsaw Convention and the Hague Protocol Agreement CAB 18990, applies where (as in the instant case) the flight itinerary includes a stop in the United States. Pan Am is a signatory to the Montreal Agreement, a private agreement that has been approved by the United States government by Exec. Order No. 23,680, 31 Fed.Reg. 7,302 (1966)
 
 
 [3]
 We discuss the causation aspect of wilful misconduct in part II(B), below
 
 
 [4]
 On February 24, 1994, an armed gunman killed a number of people in a mosque in Hebron on the West Bank